COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Agee and Senior Judge Overton
Argued at Alexandria, Virginia


ERIC KEYS

                                    MEMORANDUM OPINION[*] BY
v.    Record No. 0136-01-4     JUDGE JERE M. H. WILLIS, JR.
                                         MARCH 12, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                   Benjamin N. A. Kendrick, Judge

          Robert W. Gookin for appellant.

          Susan M. Harris, Assistant Attorney General
          (Randolph A. Beales, Attorney General, on
          brief), for appellee.


     Eric Keys was convicted by a jury of conspiracy to commit

grand larceny, in violation of Code § 18.2-22, and of four counts

of grand larceny, in violation of Code § 18.2-95.  On appeal, he

contends that the trial court erred in failing to conduct a Weimer

hearing to determine whether the Commonwealth's cross-examination

of a character witness was proper.  See Weimer v. Commonwealth, 5

Va. App. 47, 54-55, 360 S.E.2d 381, 384-85 (1987).  Because he did

not raise the Weimer hearing issue at trial, Keys is barred by

Rule 5A:18 from asserting that issue on appeal.  We affirm the

judgment of the trial court.

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## I.   BACKGROUND

### A.   OFFENSES

Eric Keys sold upscale shoes at Nordstrom's department store at Pentagon City Mall until leaving on September 8, 1998, to work at Saks Fifth Avenue.  Together with two co-workers, Ian Davis and Michael Coates, Keys fraudulently extracted money from Nordstrom's, using false merchandise returns and check cards.  A check card is a declining balance debit card that is tied to a checking account.  A return using a check card "looks like a credit which is a deposit or reversal" to the account.

Keys provided Davis and Coates account number information and expiration dates relating to bank accounts belonging to Keys, LeAndrew C. Randolph, and David Page, Jr.  With this information, Keys, Davis, and Coates created false return transactions.  They obtained SKU numbers, department class, and price information from merchandise price tags on the sales floor.  When no one was watching, they entered this merchandise information into cash registers and keyed the merchandise as returns.  When a return transaction was complete, a hard and soft copy of the transaction was generated.  The hard copy was placed in the return bin of the cash register and the soft copy was kept by whoever had entered the transaction.

A security videotape taken on August 24, 1998, showed Keys at a cash register with no customer or merchandise present.  He manually entered a price, department, and credit card number.

-

He did not imprint a credit card nor did he have a customer sign a return slip. He then placed a return slip in the cash register and put the soft copy in his pocket.

Coates received one third of the money he stole by making such false returns. Davis received half of the amounts he stole. The rest went to Keys. At Keys' direction after he left Nordstrom's, Davis and Coates continued to key false merchandise returns.

## B. TRIAL

A grand jury indicted Keys for conspiracy to commit grand larceny, in violation of Code § 18.2-22 and four counts of grand larceny, in violation of Code § 18.2-95. During his jury trial, Keys did not testify, but called two character witnesses, one of whom was his sister, Rhea Flanders.

Flanders testified that Keys was thoughtful and had done very well at Nordstrom's. She further testified, "I think it is important for the jury to know how he took his job and his responsibilities very seriously. And that's very important in this case, because they talked about his employment and his record of employment." Continuing, Flanders said that Keys went to Saks to pursue other opportunities and because he thought that he had done all he could do.

The trial court sustained the Commonwealth's hearsay objection and warned defense counsel: "Mr. Stafford [Keys' attorney], you're opening up an area on rebuttal. I hope you

-

are aware of that."  Mr. Stafford continued questioning Flanders, and she explained that Keys was much involved with his family, particularly with their mother while she was ill "during the last four years" and with helping her and her husband.

Prior to cross-examination, the Commonwealth requested a sidebar.  The following colloquy ensued:

> MR. LYNCH [PROSECUTOR]:  Your Honor, Mr. Stafford has put on evidence of his client's good character.
>
> THE COURT:  It sure sounds like it to me.
>
> MR. LYNCH:  He said he's punctual.  He said that he took his job seriously.  The implication is that he takes his job so seriously he wouldn't steal.  And she said he's a good person and cares about his family.
>
> Before I ask her if she knows anything about his previous convictions for fraud, I just wanted to clear it through you.
>
> THE COURT:  Haven't you put his character in issue?
>
> MR. STAFFORD [KEYS' ATTORNEY]:  No, I have not.
>
> THE COURT:  Well, tell me why not.  Tell me why that does not go to character.
>
> MR. STAFFORD:  Simple, Your Honor.  We are talking about how busy he is.
>
> THE COURT:  What is character?
>
> MR. STAFFORD:  Character is whether you have a good character for telling the truth --
>
> THE COURT: No.  No.  No.  No.
>
> MR. STAFFORD:  Character is --

-

THE COURT:  You're talking about -- don't get it confused with truth and veracity. Reputation for truth and veracity is not the same thing as character.

And you have put his character in issue.  I warned you about that, and you persisted.  I think you opened it up.

Character is what you are.  Reputation is what people think you are.  And there is a difference.

You've established one witness's reputation for truth and veracity correctly.  But then you've gone and put his character in issue.

MR. STAFFORD:  I don't think that I have put his character in issue.

THE COURT:  Your exception is noted for the record.

(Emphasis in original.)

The Commonwealth cross-examined Flanders about her knowledge of Keys' prior convictions of offenses involving fraud.  Keys objected regarding the lack of specificity in the questions.  His objection was sustained.  He objected to a question on the ground that it was not "pertinent."  The trial court admonished the Commonwealth to be "specific."  The Commonwealth rephrased the question more specifically.  Keys lodged no further objection.  At no point did Keys request the hearing specified in Weimer.  At no point did he challenge the accuracy of the events as to which the Commonwealth cross-examined Flanders.  Keys was convicted on all counts.  He

-

was subsequently sentenced to a total term of twenty years in prison.

## II. ANALYSIS

On appeal, Keys contends that the trial court erred in failing to conduct a Weimer hearing. In Weimer, the Commonwealth sought to cross-examine a witness, who had testified to the defendant's good character, concerning her knowledge of earlier occasions of the defendant's misconduct. The defendant objected, asserting the inaccuracy of the cross-examination. We held that under those circumstances, to avoid the opening of "'a veritable Pandora's box of irresponsible gossip, innuendo, and smear,'" the trial court "should conduct a preliminary inquiry out of the presence of the jury in order to satisfy himself:

> 1. that there is no question as to the fact of the subject matter of the rumor, that is, of the previous arrest, conviction, or other pertinent misconduct of the defendant;
>
> 2. that a reasonable likelihood exists that the previous arrest, conviction or other pertinent misconduct would have been bruited about the neighborhood or community prior to the alleged commission of the offense on trial;
>
> 3. that neither the event or conduct nor the rumor concerning it occurred at a time too remote from the present offense;
>
> 4. that the earlier event or misconduct and the rumor concerned the specific trait involved in the offense for which the accused is on trial; and

-

5. that the examination will be conducted in the proper form, that is: "Have you heard," etc., not "Do you know," etc.

And if the conclusion is reached to allow the interrogation, the jury should be informed of its exact purpose.

_Weimer_, 5 Va. App. at 54-55, 360 S.E.2d at 381, 384-85 (citations omitted).

Rule 5A:18 provides, in relevant part:

[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice.

Keys neither challenged the accuracy of the cross-examination nor requested a _Weimer_ hearing. He objected only to the lack of specificity in the questions regarding the prior convictions. Thus, he failed to preserve this issue for appeal. Rule 5A:18. The evidence reflects no miscarriage of justice or other good cause justifying an exception to the operation of the rule.

The judgment of the trial court is affirmed.

_Affirmed._

-